IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MERLENE FINNEY,<br>　　　Plaintiff, | § § § | |
| v. | § § | No. 3:12-CV-00876-BF |
| CAROLYN W. COLVIN,<br>COMMISSIONER OF THE<br>SOCIAL SECURITY ADMINISTRATION,<br>　　　Defendant. | § § § § | |

## MEMORANDUM OPINION AND ORDER

This is an appeal from the decision of the Commissioner of the Social Security Administration ("the Commissioner") denying the claim of Merlene Finney ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 423. The Court considered Plaintiff's Brief, Defendant's Brief, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. For the following reasons, the final decision of the Commissioner is AFFIRMED.

### Background[1]

### Procedural History

Plaintiff applied for disability benefits on February 6, 2009, alleging disability due to herniated cervical disk, carpal tunnel syndrome, diabetes mellitus, depression disorder, and diabetic retinopathy. (Tr. 15, 18, 81-82.) Plaintiff's application for disability was denied initially and upon reconsideration. (Tr. 15, 84-87, 90-92.)

Plaintiff requested a hearing, which the ALJ held on December 16, 2009. (Tr. 15, 93-94.)

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

Plaintiff, represented by counsel, testified at the hearing along with a vocational expert ("VE"). (Tr. 30-80.) The ALJ issued an unfavorable decision denying Plaintiff's disability claim on March 25, 2010. (Tr. 12-29.) Plaintiff requested review from the Appeals Council on April 26, 2010. (Tr. 8-11.) On February 2, 2012, the Appeals Council declined to review Plaintiff's claim, finding no basis upon which to overturn the ALJ's decision. (Tr. 1-7.) Thus, the ALJ's decision became the final decision of the Commissioner from which Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

### Plaintiff's Age, Education, and Work Experience

Plaintiff was born on January 28, 1957, and was 51 years old on her alleged onset date, September 29, 2008. (Tr. 15, 24.)  She has at least a high school education and is able to communicate in English. (Tr. 24.) Her only past relevant work[2] was as a general clerk for 15 years. (Tr. 23, 40.)  Plaintiff was last employed in March of 2009. (Tr. 39.)

### Plaintiff's Medical Evidence

**A.      Pre-Surgery**

In February 2008, Plaintiff presented to the Emergency Department at Charlton Methodist Hospital complaining of dizziness. (Tr. 260.) She was discharged with instructions given for dizziness, hypertension, and diabetes. (Tr. 261). A bone density test dated March 2008 revealed that Plaintiff's bone mineral density was considered osteopenic resulting in moderate fracture risk. (Tr. 256.) After complaining of severe neck pain, a stiff right forearm, and numbness in her hands, radiology results dated September 2008 indicated multilevel discogenic and spondylotic changes

---

[2]Past relevant work is limited to work experience within the past 15 years. 20 C.F.R. § 404.1560(b)(1).

throughout Plaintiff's cervical spine. (Tr. 254-55.) She was diagnosed with cervical disk herniation and degenerative disk with stenosis at C5-6 and C6-7. (Tr. 246.) In October of 2008, Dr. Stephen Ozanne, a neck and back specialist, recommended that Plaintiff "continue off work as her work activities [would] not allow these problems to heal." (Tr. 278.) Subsequently, a neurological test performed in November of 2008 showed electrophysiological evidence consistent with cervical radiculitis and mild to moderate bilateral carpal tunnel syndrome. (Tr. 362). When Plaintiff's pain failed to respond to appropriate non-surgical treatment, she consented to anterior cervical diskectomy that was performed on January 15, 2009. (Tr. 246.)

## B.    Post-Surgery

The surgery was performed without complication. (Tr. 246.) The post-operative radiology report showed a metal plate overlying the anterior C5 through C7 vertebra and proper alignment was demonstrated. (Tr. 251.) Dr. Ozanne noted that Plaintiff's neurology was "ok" during her follow-up twelve days after surgery and that the tenderness in her neck was expected. (Tr. 272.) The next follow-up, eighteen days after surgery, the doctor noted once again that Plaintiff's neurology was "ok" but also reflected Plaintiff's continued complaints of pain at the base of her neck with extension movement. (Tr. 271.) Forty days after surgery, Dr. Ozanne's report revealed that Plaintiff admitted her pre-operative pain was resolved by the surgery but continued to complain of some residual pain in her hands and shoulders. (Tr. 270.)

In June of 2009, Plaintiff underwent an internal consultative examination performed by State Agency Medical Consultant ("SAMC") Dr. Bonnie J. Lammers. (Tr. 340.) Plaintiff was described as a "well-developed, well-nourished female in no acute distress." (Tr. 342.) Dr. Lammers noted that Plaintiff was able to get on and off the examination table with ease. (Tr. 342.) Plaintiff's neck

3

showed marked decrease in range of motion in all planes. (Tr. 342.) Her back was non-tender and there were no spasms of the cervical muscles. (Tr. 343.)  Dr. Lammers described Plaintiff's control of her fingers on both hands as "excellent" and found that Plaintiff had full range of motion in both shoulders. (Tr. 343.)

Included in Dr. Lammers' report was her observations that Plaintiff seemed to put forth no effort during the physical examination, and that Plaintiff did not appear to actually be uncomfortable but instead was attempting to demonstrate that she was disabled. (Tr. 342.)  The report indicated that Plaintiff's examination appeared to be normal with regards to her history of cervical disk herniation and that her history was not "compatible" with a diagnosis of carpal tunnel syndrome. (Tr. 343.) Finally, Dr. Lammers noted that Plaintiff exited the clinic walking briskly and in no apparent discomfort. (Tr. 344.)

**C.      Psychiatric**

On October 26, 2009, Plaintiff was evaluated by Dr. Shiv K. Sharma at Parkland Memorial Hospital. (Tr. 433.) Dr. Sharma noted that Plaintiff's daughter died about two weeks prior to the examination and indicated that her passing had a traumatic effect on Plaintiff. (Tr. 433.) Specifically, Plaintiff was "somewhat quick to tears," but she "appear[ed] to be in no acute distress." (Tr. 434.) A daily dose of Cymbalta, prescribed by her primary care physician,  was listed under Plaintiff's then-current medications. (Tr. 434.) Finally, although citing her history of depression, Dr. Sharma assessed Plaintiff as being "very pleasant." (Tr. 435.)

**D.      New Material Evidence Submitted to the Appeals Council**

Plaintiff underwent a psychiatric evaluation by Dr. Rhonda Goen at Bluitt Flowers Health Center on October 27, 2009, just one day after her evaluation by Dr. Sharma. (Tr. 458-60.) Dr. Goen

4

diagnosed Plaintiff with adjustment disorder and depressed mood and assigned her a Global Assessment of Functioning (GAF) score of 55.[3] (Tr. 460.) The doctor noted that Plaintiff's chief complaint was depression because her daughter had just died. (Tr. 458.) Dr. Goen also made the notation that Plaintiff had no prior mental health treatment, which she indicated was a strength. (Tr. 460.) Dr. Goen saw Plaintiff again on December 8, 2009 and added grief to her diagnosis. (Tr. 478.) She also lowered Plaintiff's GAF score to 52. (Tr. 478.) Dr. Goen's treatment notes indicated that Plaintiff complained of hearing her deceased daughters's voice inside her head and sometimes thought of wrecking her car, but stated that she wouldn't do that to her family. (Tr. 477.)

### Plaintiff's Testimony at the Hearing

Plaintiff, represented by counsel, testified on her own behalf at the hearing held on December 16, 2009. (Tr. 35-73.) Plaintiff testified that her employment was terminated because she was unable to return to work and was under the care of her physician. (Tr. 40.) She reported experiencing pain in her neck, numbness in her hands, and vision problems. (Tr. 39.) She described her pain as "stinging" and like "pins sticking." (Tr. 44.) She testified to experiencing this pain constantly. (Tr. 43.) Regarding her diabetes, Plaintiff stated that she has problems controlling her blood sugar and has to take insulin. (Tr. 54.) Plaintiff testified that she generally can only use her hands for about 15-20 minutes at a time (Tr. 47.) She stated that she can only lift five pounds. (Tr. 46.) Plaintiff testified that she has difficulty gripping items and using her fingers for manipulating objects. (Tr. 46-47.)

Plaintiff stated that she could sit for about 20 minutes, but then needs to stand up because of

---

[3]A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score between 51-60 indicates moderate difficulty in occupational functioning. *See id.* at 34.

her neck pain. (Tr. 51.) Regarding her depression, Plaintiff described having suicidal thoughts. (Tr. 50.) She also testified to having difficulty with concentration and finishing tasks. (Tr. 51.) As to her daily activities, Plaintiff testified that she can do laundry intermittently. (Tr. 46.) She stated that cooking with an iron skillet or a big pot hurts her hand. (Tr. 46.) Plaintiff has not driven since the date of her surgery. (Tr. 37.)  Plaintiff testified that she weighs approximately 158 pounds and that she has lost about 10 pounds  in the past year. (Tr. 36-37.)

### The Hearing

The VE, Ms. Spence, also testified at the hearing. The ALJ posed a hypothetical question to the VE. The VE responded that an individual of Plaintiff's age, education, and work history who was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; who could sit for six of eight hours; who could stand and walk six of eight hours; who could not perform any climbing of ladders, scaffolds, or ropes; only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and who could occasionally perform movements that require extension of the neck to look above head level, would be able to perform Plaintiff's past work. (Tr. 86-87.) However, she also testified that hypothetically, in addition to the listed circumstances, if the individual was limited to following one to two-step instructions, Plaintiff's past work would be eliminated. (Tr. 74.) Nonetheless, such an individual could perform other work as a housekeeper, a photocopy machine operator, or an ironer. (Tr. 74.)  The VE testified the same individual would not be able to perform any of those jobs if, in addition to the listed circumstances, the individual had to take frequent rest breaks and was limited in using her hands for grasping. (Tr. 75.) In fact, there would be no jobs that the hypothetical individual could perform. (Tr. 75.)

Upon cross-examination by Plaintiff's counsel, the VE described the skills necessary for a

sedentary RFC. The VE listed the ability to type letters, reports, memorandums, compose and create documents, and verbal record keeping. (Tr. 75-76.) Some of the jobs that the skills would transfer to included a civil service clerk, a data examination clerk, and a sorter. (Tr. 76.) The VE responded to the Plaintiff's attorney's hypothetical question that an individual who had a high error rate due to vision problems, or any other problems, would have difficulty maintaining employment. (Tr. 77.) Further, the VE testified that recumbent rest breaks are generally not tolerated by employers. (Tr. 77.) She stated that an individual with hand and arm problems resulting in pace that was only twenty percent of that of an average worker would have difficulty maintaining employment. (Tr. 77-78.) The VE testified that if an individual were reduced to doing simple work because of attention and concentration problems, the individual would not have transferable skills. (Tr. 78.) Finally, on reexamination by the ALJ, the VE testified that no part of her testimony conflicted with the Dictionary of Occupational Titles. (Tr. 79.)

## The Decision

The ALJ utilized the familiar sequential five-step inquiry to determine whether the claimant was disabled in the March 25, 2010 decision. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 29, 2008, the alleged onset date of her disability. (Tr.17.) At step two, the ALJ found that Plaintiff had the following severe impairments: herniated cervical disk, carpal tunnel syndrome, diabetes mellitus, and depression disorder. (Tr. 17.) At step three, the ALJ found that these impairments or combination of impairments did not meet or medically equal those listed in the Regulations. (Tr. 18.) The ALJ also found that Plaintiff retained

the RFC to perform the following light work:[4]

> [Lift] and carry[] 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk 6 of 8 hours. She can sit 6 of 8 hours. Pushing and pulling are limited to the weights given. She can occasionally climb ramps or stairs. She cannot climb ladders, ropes or scaffolds. She can occasionally crawl. She can frequently reach handle and finger [sic]. She can occasionally perform movements that require extension of the neck to look above head level. She cannot work in proximity to hazards, including driving a vehicle or other heavy equipment. She can perform 1-2 step instructions.

(Tr. 19.) Based on this RFC, the ALJ found at steps four and five that Plaintiff was unable to perform any of her past relevant work, but that she could perform other work as a housekeeper, a photo copy machine operator, or an ironer. (Tr. 23-24.)

Finally, the ALJ noted that there was an issue as to whether Plaintiff met the insured status requirements of the Social Security Act. (Tr. 15.) Because Plaintiff's earnings records showed that she acquired sufficient quarters of coverage to remain insured through December 31, 2012, the ALJ found that the requirements were satisfied. (Tr. 15, 17.) Thus, the ALJ noted that Plaintiff had to establish a disability during the relevant time period between October 29, 2008 (alleged onset of disability) and December 31, 2012 (date last insured) in order to be entitled to DIB. (Tr. 15.)

## Standard of Review

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically

---

[4] Light work is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying up to 10 pounds. Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b).

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is

disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not
   be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be
   disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the
   regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past,
   a finding of "not disabled" must be made.

5. If an individual's impairment precludes her from performing her past work,
   other factors including age, education, past work experience, and residual functional
   capacity (RFC) must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability.

*Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies

her burden under the first four steps, the burden shifts to the Commissioner at step five to show that

there is other gainful employment available in the national economy that the claimant is capable of

performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied

either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational

testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct claimants how the Commissioner will consider the opinions.[5] In the Fifth Circuit, "the opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton*, 209 F.3d at 455; *see Floyd v. Bowen,* 833 F.2d 529, 531 (5th Cir. 1987).

---

[5] The terms of 20 C.F.R. § 404.1527(a)(2) provide:

(2) Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

## Issues

1.      Whether the ALJ failed to follow the treating physician rule.

2.      Whether the ALJ failed to properly evaluate Plaintiff's credibility.

3.      Whether the Appeals Council properly evaluated new evidence.

## Analysis

### Whether the ALJ Failed to Follow the Treating Physician Rule

Plaintiff first alleges that the ALJ failed to give proper weight to her treating physician's opinion. (Pl.'s Br. at 18.) Great weight should be accorded to the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses. *Newton,* 209 F.3d at 455 (citing *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237). Controlling weight will be given to a treating physician's opinion on the nature and severity of a patient's impairment if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2). If it is found that a treating source's medical opinion is not well-supported or is inconsistent with other evidence, the opinion should not be rejected; rather, the opinion is merely not entitled to "controlling weight." *See* SSR 96-2p.

In many cases, a treating physician's opinion should still be adopted even if it does not meet the test for controlling weight because it is entitled to some deference. *Id.* On the other hand "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 456. If good cause is shown, then the ALJ may accord the treating physician's opinion

11

less weight, little weight, or even no weight. *Greenspan,* 38 F.3d at 237. If the ALJ does not accord

a treating doctor's opinion controlling weight, the ALJ must set forth specific reasons for the weight

given, supported by the medical evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2). The reasons

must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator

gave to the treating source's medical opinion and the reasons for that weight. The ALJ must explain

the weighing in the decision, and the weight will stand or fall on the reasons set forth in the opinion.

*Newton,* 209 F.3d at 455.

Here, the ALJ gave little weight to Dr. Ozanne's opinion, found in a questionnaire dated

three months after he stopped treating Plaintiff, that Plaintiff's impairments would interfere with her

attention and concentration to perform even simple work tasks 34% to 66% of an eight-hour

workday. (Tr. 23.) First, the ALJ took issue with classifying Dr. Ozanne as Plaintiff's treating

physician. The ALJ highlighted the fact that Dr. Ozanne completed his opinion questionnaire three

months after he stopped treating Plaintiff. (Tr. 23.) Next, the ALJ indicated that Dr. Ozanne's

designation as a neck and back specialist rendered his opinion less convincing. (Tr. 23.) Finally, Dr.

Ozanne did not list sufficient objective findings upon which his opinion was based. (Tr. 23.) The

objective examination notes by Dr. Ozanne that did exist contradicted his conclusion. (Tr. 23.)

Plaintiff argues that the reasons cited by the ALJ do not constitute the "good cause" required by the

Fifth Circuit. (Pl.'s Br. at 19.)

Plaintiff's argument fails despite an error in the ALJ's findings. Dr. Ozanne's functional

assessment that Plaintiff's condition was severe enough to interfere with performing simple work

tasks 34% to 66% of an eight-hour workday was dated in August of 2009. (Tr. 445-49.) According

to Dr. Ozanne's own records, though, the last time he examined Plaintiff was in May of 2009. (Tr.

369.) Dr. Ozanne's notes from the May appointment indicate that Plaintiff's medical insurance had been discontinued and she would have to seek treatment under the indigent health care program at Parkland. (Tr. 369.) The ALJ pointed out that Dr. Ozanne's identification on the August questionnaire of "current" as the time-frame for which he had treated Plaintiff was "clearly erroneous." (Tr. 23.) However, the ALJ failed to take note of the statutory definition of a treating physician: "an acceptable medical source who provides [the applicant], *or has provided [the applicant]*, with medical treatment or evaluation and who has, *or has had*, an ongoing treatment relationship" with the applicant. 20 C.F.R. § 416.902 (emphasis added). Thus, regardless of Plaintiff's gap in treatment with the doctor, the ALJ should have recognized Dr. Ozanne as Plaintiff's treating physician based on his previous ongoing history of treating her. However, to the extent the ALJ discredited the opinion as "current," the ALJ was accurate. Dr. Ozanne did not provide an opinion on Plaintiff's current health status, but instead opined on her condition as it was at least three months prior. Dr. Ozanne was unaware of the current status of Plaintiff's impairments.

Despite the ALJ's failure to properly recognize Dr. Ozanne as Plaintiff's treating physician, the ALJ still had good cause to give his opinion little weight. An ALJ may "discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory . . .or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 456. Here, the ALJ examined the medical records to determine whether the objective evidence supported Dr. Ozanne's conclusion in light of the consultative examiner's contrary conclusion. In Dr. Ozanne's second to last examination of Plaintiff he characterized Plaintiff's neurology exam as "normal" but also indicated that the focus of Plaintiff's pain was the "muscle attachments around C7." (Tr. 372.) After a few missed appointments, Dr. Ozanne examined Plaintiff for the last time, and described her neck as only

13

"slightly tender" but concluded that her "motion was overall good" and her circulation was "ok." (Tr. 369.) The ALJ concluded that the objective findings did not support Dr. Ozanne's conclusion. The ALJ did not "cherrypick" the objective findings that would support his decision. Rather, there was relatively little objective information in the record at all, further supporting the ALJ's conclusion that the evidence did not support Dr. Ozanne's opinion. Moreover, the ALJ found that the objective evidence in the consultative examiner's report did not support Dr. Ozanne's opinion either. The ALJ cited Dr. Lammers' notes that Plaintiff's back was not tender and showed no spasms of the cervical, thoracic, or lumbar muscles; and Plaintiff did not display any unease in toe, heel, or tandem walking. (Tr. 21.)

The Court finds that the ALJ did not commit legal error by failing to give Dr. Ozanne's opinion controlling weight. Though the ALJ may have failed to properly designate Dr. Ozanne as Plaintiff's treating physician, the error was harmless. Even if Dr. Ozanne had been found to be Plaintiff's treating physician, the ALJ listed specific reasons for rejecting his opinion. The reasons, especially the lack of supporting objective medical findings in evidence, were within the Fifth Circuit's ambit of "good cause" for assigning little or no weight to the opinion of a treating physician. Thus, Plaintiff's contention fails.

### Whether the ALJ Failed to Properly Evaluate Plaintiff's Credibility

Plaintiff contends that substantial evidence does not support the ALJ's credibility findings. (Pl.'s Br. at 20.) If the claimant's statements regarding the intensity, persistence or limiting effects of her symptoms are not consistent with the objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements. SSR 96-7p, 1996 WL 374186, at *2. There

are certain factors the ALJ may consider when he needs additional information to evaluate the credibility of the claimant's statements: (1) daily activities of the claimant; (2) location, duration, frequency, and intensity of symptoms; (3) aggravating factors; (4) medication and its side effects; (5) treatment received for symptoms; (6) other measures used to relieve symptoms; and (7) any other factors concerning restrictions due to pain or symptoms. *Id.* at *3.

Here, the ALJ found that Plaintiff's medical impairments could be the cause of her symptoms, but that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent" with the RFC assessment. (Tr. 22.) The ALJ cited several reasons to support this determination. First, the ALJ noted Plaintiff's history of noncompliance. (Tr. 22.) Together with evidence in the record demonstrating that she experienced significant relief from surgical treatment, her noncompliance led the ALJ to afford Plaintiff's testimony less credibility. (Tr. 22.) Next, the ALJ stated that the objective findings and tests did not support the severity of Plaintiff's allegations that her symptoms and pain came back suddenly a few months after her surgery. (Tr. 22.) Finally, the ALJ pointed to Bluitt Flowers treatment notes revealing that Plaintiff walked in the mall and was instructed to exercise three times each week, concluding that this did not support Plaintiff's alleged limitations. (Tr. 22.)

The ALJ went through the proper factors to assess Plaintiff's credibility. The ALJ's determination is entitled to "great deference" as long as substantial evidence supports it. *Newton*, 209 F.3d at 459. As examples of Plaintiff's noncompliance, the ALJ noted evidence from October 2009 indicating that she was not maintaining her advised diet and was shaking her insulin, which reduced its effectiveness. (Tr. 22, citing Tr. 425-27.) Other treatment notes showed that she was not using the wrist splint previously provided to her. (Tr. 21, citing Tr. 341.) In addition, Plaintiff did not

undergo the physical therapy treatment recommended by Dr. Ozanne after her surgery despite physical therapy being of some benefit to her before her surgery. (Tr. 21, citing Tr. 341.) At the hearing, Plaintiff testified that the physical therapy provider told her "they couldn't do no more." (Tr. 67). Plaintiff stopped taking her medicine in 1999-2000, but testified that she was paying for her daughter's medications at the same time and thus could not afford to pay for her own. (Tr. 71.) Plaintiff failed to address at the hearing why she was not using her wrist splint or why she was not controlling her diabetes. (See Tr. 32-80.)

In some cases, a finding of noncompliance with treatment precludes a finding of disability. 20 C.F.R. § 404.1530 ("If you do not follow the prescribed treatment without good reason, we will not find you disabled."). Here, the ALJ did not go so far as to deny Plaintiff disability benefits solely because of her history of noncompliance. Instead, the ALJ considered the noncompliance as part of the assessment of Plaintiff's credibility. The facts cited by the ALJ and listed above support an inference that Plaintiff's symptoms were not severe enough to merit compliance with her treatment.

The ALJ also considered Plaintiff's daily activities when evaluating her credibility. Specifically, the ALJ noted that Plaintiff was able to walk around the mall and was directed by her physician to exercise three times per week. (Tr. 22.) Plaintiff testified that she could lift a glass but that an iron skillet or a large pot hurt her hand. (Tr. 46.) Plaintiff also testified that she was able to fold clothes intermittently and care for herself personally. (Tr. 46.) The ALJ determined that Plaintiff's testimony related to her daily activities undermined her credibility when considered together with the objective medical evidence in the record. Specifically, the ALJ noted that Dr. Ozanne found Plaintiff's neurological exam to be normal in March 2009 (tr. 23, 372), and that subsequent treatment and examination notes stated that Plaintiff's muscle strength was 5/5 bilaterally

16

in her upper and lower extremities. (Tr. 20.) The objective evidence indicated to the ALJ that Plaintiff "experienced significant relief with treatment and surgery." (Tr. 22.) Subjective complaints must be corroborated by objective medical evidence. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

The Court finds that substantial evidence supports the adverse finding against Plaintiff's credibility. The ALJ considered the proper factors under the law of the Fifth Circuit in assessing her credibility, and listed specific reasons for his findings. There is no reason why the ALJ's opinion should not be accorded due deference.

## Whether the Appeals Council Properly Evaluated New Evidence

Plaintiff's final contention is that new evidence submitted to the Appeals Council after the ALJ's decision was not given due consideration. (Pl.'s Br. at 13.) The Regulations provide a claimant the opportunity to submit new and material evidence to the Appeals Council for consideration when deciding whether to grant a request for review of an ALJ's decision. 20 C.F.R § 404.970(b). For new evidence to be considered material, there must exist "the reasonable possibility that it would have changed the outcome of the Secretary's determination." *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994) (quoting *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981)). Additionally, to be considered material, the evidence must "relate to the time period for which benefits were denied." *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985). Evidence of a later-acquired disability or a subsequent deterioration of a non-disabling condition is not material. *Id.*

New evidence before the Appeals Council is a part of the record upon which the

Commissioner's final decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). When considering that final decision, a court should review the record in its entirety, including the new evidence, and should remand only if the new evidence "dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported." *Lee v. Astrue*, No. 3:10-CV-155-BH, 2010 WL 3001904, at *7 (N.D. Tex. July 31, 2010) (citing *Higginbotham v. Barnhart*, 163 F. App'x 279, 281-82 (5th Cir. 2006)). It is of no importance whether the Appeals Council specifically addressed the new evidence in its denial of review. *See Higginbotham*, 405 F.3d at 338 n.1 ("[T]he requirement of a detailed discussion was suspended by a memorandum from the Executive Director of Appellate Operations. . . ."). *If the new evidence is material*, the issue is whether it diluted the record so much that the ALJ's decision became insufficiently supported. *See Lee*, 2010 WL 3001904, at *8.

Here, the Notice of Appeals Council Action stated "[i]n looking at your case, we considered . . . the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the [ALJ's] decision." (Tr. 1-2.) The additional evidence consisted of 371 pages of records from Plaintiff's physicians and counselors. (*See* Tr. 450-821.) Plaintiff argues that the new evidence is so inconsistent with the ALJ's findings that it "undermines the evidentiary foundation of the ultimate disability determination . . . ." (Pl.'s Br. at 14.) Specifically, Plaintiff points to the results of her examination with a pain specialist, dated June 25, 2010, as being inconsistent with the ALJ's finding that her symptoms were alleviated by surgery. (Pl.'s Br. at 16, citing Tr. 805.) However, the results of this examination are immaterial because they do not relate to the relevant time period. That is, the examination postdated the ALJ's March 25, 2010 decision.

18

The bulk of the other new evidence consisted of individual counseling notes regarding Plaintiff's depression. A psychosocial assessment dated October 27, 2009 indicated that Plaintiff had been diagnosed with depression in the past and was again reporting symptoms of depression. (Tr. 456.) A psychiatric evaluation, also dated October 27, 2009 showed that Plaintiff's depression was exacerbated by the recent death of her daughter and assigned Plaintiff a GAF score of 55. (Tr. 458-60.) On November 16, 2009, progress notes indicated that Plaintiff was "doing fine" and that she was handling the passing of her daughter "ok." (Tr. 466.) Another evaluation dated November 16, 2009 listed Plaintiff's appearance as well-groomed, her attitude as cooperative, and her thought processes as goal-directed. (Tr. 470.) Plaintiff's mood was noted as depressed, but this was attributed to grief, and the evaluation noted that Plaintiff denied any plan or intent as to suicidal or homicidal ideation. (Tr. 470.) The examiner described Plaintiff's "[l]imited prior mental health treatment" as a strength. (Tr. 471). Psychology follow-up notes between December 7, 2009 and December 8, 2009 described a decrease in Plaintiff's GAF score to 52 and described Plaintiff as continuing to experience grief and bereavement. (Tr. 475-78.)

The new evidence described above does not contradict the record to the extent that it no longer supports the ALJ's decision. While Plaintiff was assigned GAF scores of 55 and 52, those treatment notes also indicated that Plaintiff's worsening symptoms of depression were attributable to the unexpected passing of her daughter. (Tr. 458.) She had no psychiatric treatment history, nor did she have suicidal or homicidal ideation. (Tr. 459.) Plaintiff's judgment was listed as intact and her insight regarding the presence of her depression was good. (Tr. 459.) Although Plaintiff's mood was "[d]epressed and [a]nxious," she was described as well-groomed, cooperative, calm, and goal-directed. (Tr. 477.) Finally, on November 16, 2009, it was noted that Plaintiff was doing fine. (Tr.

466.)

The ALJ explicitly stated in his findings that Plaintiff's depression was a factor considered in making his decision. (Tr. 22.) The ALJ explained that despite only "minimal evidence of record" pertaining to Plaintiff's depression, he gave Plaintiff "the extreme benefit of all doubt" by considering her depression and psychological difficulties in calculating her impairments. (Tr. 18, 22.) There was no indication in the new, material evidence that the intensity, persistence, or limiting effects of Plaintiff's ailments were any different than what was already considered by the ALJ. The remainder of Plaintiff's new evidence, dated in June and August of 2010 and beyond, arose after the ALJ's March 2010 decision. Thus, the remaining new evidence is not relevant to the contested time period and will not be considered by this Court.

The Court finds that the new and material evidence submitted by Plaintiff to the Appeals Council does not dilute the record such that the ALJ's findings are no longer substantially supported. Therefore, this Court concludes that the ALJ's decision is supported by substantial evidence and remand is not required.

## Conclusion

For the foregoing reasons, this Court AFFIRMS the Commissioner's final decision as it is supported by substantial evidence and the Commissioner did not commit prejudicial legal error.

SO ORDERED, April 17, 2013.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE